Warning, Your Honor, and may it please the Court, Joshua Dorothy, on behalf of Appellants Larry and Diane Zavadil, I'm joined at council table today by Joan Eiland, co-counsel for the Zavadils. The legal principles that govern this case are not disputed between the parties. What is at issue is their application to the facts as found by the tax court, and in particular, the tax court's erroneous conclusion of law that is unsupported by and, in fact, contradicted by the tax court's own fact findings. This case involves, in summary, a series of tax-favored transactions engaged in by the Zavadils through the use of an agent, American Solutions for Business, which is Mr. Zavadil's employer. The Zavadils, and in particular, and primarily Mr. Zavadil, would direct American Solutions for Business to, among other things, make charitable contributions on their behalf and then bill those items to a ledger that was maintained by American Solutions for Business for the Zavadil's personal expenses. At the end of each month, Mr. Zavadil would write a check from the same personal checking account to pay off that ledger. This mechanism, the monthly repayment, was not only agreed to between the Zavadils and American Solutions for Business, but it was, as the tax court itself found, required by the third-party creditors of American Solutions for Business. At the end of the year... I don't see the relevance of that, frankly. I'm sorry, Your Honor, the relevance of which part? That it was required by the creditors. Well, Your Honor, that it was... It's emphasized in the briefs, but I don't understand its significance to the tax issue. Well, Your Honor, that it was required by the creditors goes to the question of whether or not Mr. Zavadil's obligation was a bonafide debt of the Zavadil's to American Solutions for Business. And... Why? Well, okay. Your Honor, if... Absent the third-party creditors, there might be a fact question about whether there was some collusion here between American Solutions for Business and the Zavadils, that American Solutions for Business would, in the end, bear the economic burden of the tax-favored transactions, of the contributions and the other payments that American Solutions for  Business would have. But the presence of the third-party creditor makes it abundantly clear that it wasn't... That it couldn't have been a collusive effort between the Zavadils and American Solutions for Business for American Solutions for Business to pay these transactions and the Zavadils. I don't think collusion's an issue. No, Your Honor, but it would be the opposite of a bonafide debt. And the presence of the third-party creditor and the third-party creditor's insistence that these... That this ledger be paid off demonstrates that it was the intent both of the two parties to the ledger, American Solutions for Business and the Zavadils, but also the intent of a third party that this be a bonafide debt and that the Zavadils, in the end, bear the economic transactions for which they were asking American Solutions for Business to advance the funds up front. Let me ask a question that I don't know if you'll have to tell me whether it goes beyond the record. I assume there was the usual negotiation between the IRS and the taxpayers before the final deficiency that's challenged in the lawsuit.  The standard practice would be a lot of documents would be produced by the taxpayer. A lot of documents were produced, Your Honor. Both the taxpayers' instance and the IRS' insistence. Would those documents have included the ledger account for 2006? Your Honor, I do not believe that the service ever requested the ledger account for 2006. I believe that all that was exchanged between the parties were the . . . And it was not offered or produced? No, Your Honor. I do not believe in the negotiations the taxpayers ever offered any documents beyond the tax years that were at issue, with the exception, Your Honor, I believe of a . . . there was one bank statement dated in the first couple of days of January of 2006, which would have shown activity for the month of December 2005, but because the bank issues . . . The tax court then relied on it as an adverse factor? Yes, Your Honor, it did. Whereas the positive facts for the taxpayers would have come in the ledger account later in the year? Yes, Your Honor, they would have. And nobody thought to worry about that? Your Honor, the . . . no. Candidly, no. But the bona fide debt was established within the record that was presented to the tax court, and in particular by the testimony both of Mr. Zavagil and of an American Solutions for Business employee, Gladys Freese, regarding how the ledger operated, what Mr. Zavagil's obligation was to repay the ledger, and that he in fact had engaged . . . and the parties had engaged in a practice of him repaying it. And at least for the first 18 months of the period at issue, Mr. Zavagil had fully paid off the ledger every month, and he continued to make payments, albeit with rollover advances, so that the total amount for which he was obligated continued to accumulate, but he was making monthly payments even during the final six months that the tax court took issue with. You mean between July 2005 and the end of 2005, he was making monthly payments? Yes, Your Honor. He made payments at the end of each month. But he didn't show, according to the tax court, that he had paid for the charitable contributions made during that period? You didn't put on evidence . . . I guess that's what we've already covered. You didn't put on evidence that he paid in 2006 to repay for 2005 charitable contributions? Correct, Your Honor. He didn't put on evidence . . . we didn't put on evidence that in 2006, the Zavagils ultimately paid off the debt that they had been accumulating. But, Your Honor, that doesn't change this. The tax court viewed that as a failure of proof, I guess. What's your response to that? Your Honor, I would disagree that the failure to put on the 2006 ledger or further bank statements in 2006 is a failure of proof of the bonafide debt. The debt was bonafide when it was incurred and would be the same as if the Zavagils had charged these amounts. When did this circular flow of funds theory emerge? Your Honor, it emerged, as best I can recall, in the post-trial briefing from the commissioner. There was no testimony about a circular flow of funds. What was the commissioner's theory that you thought you were . . . I don't know if you tried it, but you thought you were dealing with a trial. Your Honor, the commissioner's main thrust at trial was an argument against the agency theory that the Zavagils had been relying on from when they filed the tax return, that there was no agent in making these transactions. The commissioner's thrust in response was that there was no agency relationship and that the charitable contributions and the other expenses that were charged to the ledger were American Solutions for Business expenses because the checks that the charities actually received were checks drawn on American Solutions for Business bank account. Despite the fact that the Zavagils had directed those checks be drawn, that those amounts be posted to Mr. Zavagil's ledger and that the Zavagils would pay them off at the end of each month. Does the record show whether ASB ever took charitable contribution deductions? There was testimony of that effect, Your Honor, and American Solutions for Business did not take the deductions for either the charitable contributions or the other . . . Did they take any deductions for charity, for charitable? Do we know for now? Yes, Your Honor. I believe there was testimony that they did and the amount that they took was significantly smaller than the amount that the Zavagils were claiming. I think it was $5,000 or $10,000 as opposed to the hundreds of thousands that the Zavagils contributed. Do you disagree with the tax court's finding that from July through November, Zavagil caused ASB to advance funds to account number 5458 to cover the checks drawn on that account to pay off his ASB ledger for those months? Is that an accurate finding? Yes, Your Honor. The Zavagils requested that ASB advance funds in the next month to cover the checks that had been drawn to pay off the previous month. All right. So that's the circular flow of funds. And, Your Honor, it's no different than a debtor rolling over a monthly credit account at a bank. The debt is still incurred. It's still a bonafide debt. If the Zavagils had borrowed this money from a bank with requirement that it be repaid at the end of 30 days and at the end of the 30 days had asked the bank to re-advance the That leaves the question of even if the debt was bonafide, if it was never repaid, what's the effect of that non-payment on the tax deduction? Your Honor, I've seen no authority and the Commissioner has appointed no authority that a taxpayer who incurs a bonafide debt and takes the tax deduction has to unwind that tax deduction if the taxpayer later defaults on the debt. Why wasn't that brief? That seems like it's critical to the case. I mean, I didn't see it in either brief. Your Honor, because the authority that's out there with regard to contributions and other tax-favored transactions that are incurred with borrowed funds is that the tax consequences all fall within the year that the actual contribution is made. And the tax consequences of the debtor defaulting on the debt would most likely be a bad debt write-off by the creditor, which would then be taken in the year of the write-off, whether that was, although it didn't happen in this case, but if there had been a bad debt write-off, whether that would have been in 2006 or 2007, that would be a separate tax transaction to be taken in a separate year. Unless the Court has further questions at this time, I'd like to reserve the balance of my time for rebuttal. Thank you. May it please the Court, I'm Curtis Pett, representing the Commissioner. Let's start with the last point. Do you agree that a taxpayer who borrows to take a deduction to fund an expense that is goes into bankruptcy in year two and can't repay the debt? Yes, Your Honor, I think that is the rule. A taxpayer can make charitable contributions with borrowed funds, provided that the debt is a bona fide debt. And I don't understand the circular flow of funds theory as defeating this claim, frankly. Well, as we discuss at page 19 of our brief, normal bona fide debt exhibits the following Correct, Your Honor. There are two separate issues. One, did Mr. Zabadil bear the economic burden of the payments? Did he actually pay the amounts in 2005? Or was it a bona fide? He borrowed to pay it. Unless you lose the agency issue, that's clear. There's no evidence that his ledger account balance at the end of 2005 constituted a bona fide debt. Evidence of a bona fide debt would include items like a written debt instrument, a provision for interest, a fixed repayment schedule, actual payments in accordance with the fixed repayment schedule, a provision for collateral, and conduct of the parties as if the transactions were a debt. There's none of that evidence. You're talking about arm's length people. Here's a chap that's getting well over a million dollars a year from ASB as a result of the deferred payment for the business, right? That's correct. Now, how did you link the advances with those obligations? I don't understand the question. Why isn't it a fair inference that the advances were, if they couldn't be repaid in the continuing fashion, they'd simply offset future payments of the sale of the business? $28 million over 20 years, right? Hadn't begun to reach the 20-year point. So there's no question ASB had the ability to negate or get repaid through offsets, right? Well, but that's a different question. No, I mean, let's talk about the practical realities. And why would, I mean, you're talking about a huge windfall for the Treasury because it's obvious that ASB didn't take the charitables. I think the inequity of the government's position on the charitables is stark. Well, Your Honor, but tax deductions aren't matters of equity. They're matters of congressional grace. And the statute says that you have to— Charitables are not bona fide. Pardon me? That's a fundamentally equitable notion. Why don't you go into why you think the debt is not bona fide? Why does it have to meet these criteria that you just set out? Well, there's absolutely no evidence of a bona fide debt. We've got this circular payment scheme, but there's no evidence that Mr. Zabedel was legally obligated to pay ASB that amount back or that ASB intended to enforce that obligation to pay it back. The record just simply doesn't have the evidence. The Zabedels had the burden of proof. They had the ability through the deferred purchase payment. Well, at best, Your Honor, that would be an assumption that could be drawn from the sparse record in this case, but the standard of review is clear error, and the tax court looked at the record as a whole. They come up with this circular funds theory, which wasn't the basis for trying the case, and they use it to contrive a gigantic windfall. Well, as the tax court set out in the chart— We're charged with reviewing. Well, the fact of the matter is that these charitable contributions were claimed in 2005, and Mr. Zabedel did not bear the economic burden of those. It was ASB that bore the economic burden of those, and the fact that ASB— That's true of every borrowed deductible expense. Well, that's assuming that you have a legitimate loan. I mean, transfers of money don't— Give me $5 for—I didn't bring my wallet for lunch today. There's no documents. There's no collateral. There's nothing except—but it's a legitimate. Yeah, but you could go to court, and the guy could say, Well, you know, way back when, I did him a favor, so I felt like he owed it to me. It's a question of fact. You'd say, What were the facts? I gave him $5. I thought—I expected him to pay me back. He says, Well, I never intended to pay him back. I just thought he was doing me a favor. So it's all a matter of fact, and we're looking at a clearly erroneous standard of review, and the tax court looked at the record as a whole and said, I see no evidence of a bona fide debt. Everything in the stream of offense. The tax court admits for the year and a half of the two years, there was a regular repayment, and then it says in a classic gotcha, Aha, but you didn't show us what happened in 2006, so we can disallow everything because of that failure of showing, despite all the circumstantial evidence being that the relationship didn't change and would have continued into the future. So I think the failure of proof here is the government's. Well, actually, I think the tax court gave them the benefit of a doubt. There wasn't a consistent repayment of the ledger account balance at the month end, but as of June of 2005, it was paid down to zero without any advances. The tax court said, OK, as of now, he paid the money out of his bank account. It's all paid back. I'm going to give him the benefit of those charitable contributions, and we're not taking issue with that. But then for the second half of the year, he had racked up a $1.6 million ledger account balance, and there was no evidence on the record that he was legally obligated to pay that back under an agreement between him and the ASB. And so as a matter of fact, the court said there's been no repayment, so he did not pay cash for those charitable contributions in that year, and they failed on their burden of proving that there was a bona fide loan obligating to pay him at that time. It has to occur in the taxable year. So it's a little different situation. And it does boil down to the burden of proof. They put on no proof that there was a legitimate loan. Their only argument is that the circumstantial evidence could be viewed as a whole by a trier of fact to say, well, there must have been a loan. The region pays out of its own pocket on behalf of the principal. What tax case says that there has to nonetheless be a proof of some bona fide loan transaction? Well, the cases that say that the charitable contribution has to be made during the taxable year. I asked you an agency question. I didn't ask about cases that are factually disparate. Once the agency relationship is established, what tax case says that if the facts stop with the agent simply paying on behalf of the principal, the taxpayer nonetheless has to affirmatively prove a bona fide loan? I would be pretty certain. I'd give pretty good odds you haven't got a case on that that says that. Well, I don't think there's a case that says that if . . . Okay, well, now we've got to decide that, don't we? We've got a brand new issue the tax court never thought of. Well, it's the last day of the year. I'm tied up, and I'm saying I want to give $100 to the Salvation Army, but I can't. My wife wants me at home, so here's $100. Would you please give this to the Salvation Army for me? Or would you please, on your way home, give $100 to the Salvation Army for me, and I'll make it up to you next year? This is a more formal agency relationship than that, which the IRS knew because that's what it tried to fight at the trial. But still, the record is devoid. There is no factual basis on the record that there's a legally binding obligation. Let me just ask you, what tax case says that the failure to prove in that situation when a bona fide agent . . . All the evidence shows is a bona fide agent's made a deductible expense payment on behalf of the principal. If the taxpayer fails to show a bona fide loan transaction, the deduction fails. Well, I don't . . . there's not a case that I'm aware of that would say that an agent making a deduction on behalf . . . half of a . . . or making a contribution on behalf of the principal with its own funds . . . would entitle the principal to a tax deduction in the year in which it does that. I don't think there's a case that would support that. Or statute . . . or any legal basis to support the charitable contribution on that basis. You're talking about some agency principles that I don't think you're right on. But I'm . . . we're just talking burden of proof. Right. I'm just saying when the taxpayer shows a bona fide . . . a true agent on behalf of the principal . . . paid the money for which the principal claims a deduction . . . that now the tax court and the commissioner can require as a further evidence . . . proof devices. The rule is either pay in cash in the taxable year in which you're claiming the deduction . . . or you have a bona fide debt. You can make a contribution with borrowed funds . . . but there's no rule that if somebody else makes a . . . if you give money to Salvation Army on my behalf . . . that would entitle me to claim a deduction for that contribution in that year . . . I would submit that there's no authority for that proposition. If it's the last . . . if it's December 31st . . . and I say, do me a favor, give the Salvation Army a hundred bucks . . . I'll pay you back sometime when I come up with the money . . . and you say, okay, we're friends, I'll do it . . . and then I claim a deduction for that year . . . I can say you were my agent, but . . . That would be a very different case than this one. I think it's similar. Well, what was the testimony or the evidence of . . . that this arrangement ended up creating a bona fide debt? Created a bona fide debt? What was the evidence? Was it just Mr. Zavadil's testimony that he was obligated to repay? He testified that the creditors required that his ledger account be balanced . . . be paid off at the end of every month. That was the only evidence. Was there any documentation? Any, for example, e-mails, letters, any kind of memoranda that supported that testimony? Oh, there's no dispute that the third party creditors did have that requirement . . . and that circular payment scheme, I think, did zero out the ledger balance . . . So, that requirement was technically complied with, but that alone does not establish . . . there's a bona fide debt agreement between Mr. Zavadil and ASB. The fact that the third party lender did not want . . . evidently did not want these advances to go on beyond one month . . . So, Mr. Zavadil gives testimony supporting his position. Can the tax court reject uncontradicted testimony? Absolutely. And, that testimony really didn't even go towards any sort of a bona fide loan agreement . . . between Mr. Zavadil and ASB. All that testimony said was the third party creditors required . . . that the ledger account balance be paid down to zero at the end of each month. And, that doesn't bear on the question as to whether there's a bona fide loan agreement . . . between Mr. Zavadil and ASB. Well, I guess we can look and see exactly what he testified to. But, assuming he gave testimony that supports the position that he's taken today . . . can the tax court, by simply making a credibility finding, reject that testimony? Yes, the . . . What's the law on that? But, they didn't. There wasn't any adverse credibility finding, was there? It was a failure . . . No, it's just complete failure proof on this. Well, the court did say he introduced no credible evidence . . . that his ledger account balance at the end of 05 represented bona fide indebtedness. Do you think that's a credibility finding? Yeah, you could say that. That his testimony was irrelevant and incredible, both. I guess that would be the proper way to characterize that, yes. But, I would say the uncontradicted documentary evidence of a stream of repayments . . . was some evidence of a continuing recognition by both parties . . . that the December 05 advance would likewise be repaid, somehow. Well, at most . . . You say that there's no evidence when they've already . . . the tax court has already said there's undisputed evidence of 18 months of steady repayments . . . and you say, no, they weren't steady or consistent and they . . . I know they bounced around, but it was a stream of repayments. Well, at most, that would be some fact and the trier of fact has to balance all the facts and . . . The tax court said no evidence and they weren't . . . that was a stretch. Well, I'm saying no evidence. The tax court said they did not meet their burden of proving that they bore the economic burden . . . or that there was any bona fide debt agreement. That evidence was credible, but I just . . . the undisputed documentary evidence of 18 months of some repayments . . . Well, there have been some repayments, but the taxpayer bears the burden of proof. You can say it doesn't go to the question of . . . which I think would be wrong or you can say it doesn't prove the question, which is of the later advances. The first part that was allowed, it wasn't based on a bona fide debt. It was based on actual cash payments that were made. They weren't made actually in the month, but when he paid his ledger account down to zero . . . the necessary assumption the tax court had was that . . . Let me just stop you there. There were payments made by ASB out of the ledger account in 2004 . . . and the records showed that the repayment, the circular repayment as you call it . . . from Zavadil didn't come until 2005. When was the deduction allowed? At various points in 2004, it was paid down to zero as well. I know, but was there ever a repayment in 2005? There was a repayment in 2005 in June . . . Or in 2004? I don't think so, no. What if there had been? What do you think? What would the Commissioner's position have been? The deduction's not good until 2005? Well, I hadn't really thought about that, but that's a possible argument. The tax court's opinion would suggest it was in 2004. It was, you know, the date claimed. The tax court is looking at the situation and says, here you've got this . . . Mr. Zavadil does not have an ownership interest in this company. This company is paying out cash. It's money. And, he's claiming deductions for some of those payments. And, he's saying he's not entitled to it because it wasn't his money. You can't make charitable contributions with somebody else's money. And, up until June, he paid the money back. So, the court said, okay, that was his money. But, in the second half, the contributions that he's claiming were not made with his money. They're made with ASB's money. So, then the second question would be, well, if there's a legal obligation to repay that, then he also can have credit for those contributions. And, the tax court said, I don't see it in the record. From what I've seen in this record, I do not conclude that there was a bona fide debt requiring repayment of that. So, either way, there's a complete failure of proof. It was contributions paid with somebody else's money. On this record, that's what the tax court was looking at. And, that's what the tax court concluded. And, I think the record does support that conclusion. The fact that other evidence could have been submitted is beside the point. And, the fact that another finder of fact could look at the record as a whole and draw different conclusions also. Thank you very much. Mr. Dorothy, do you have some time? Your Honors, the service takes issue, the commissioner takes issue with the lack of evidence of debt. The ledger itself is the documentary evidence of the debt. Mr. Zavagil and Ms. Fries both testified that the very purpose of the ledger was to record the amounts that Mr. Zavagil owed to American Solutions for Business. That was the only purpose for this contemporaneous record of the amounts that American was advancing on Mr. Zavagil's behalf. And, as the tax court found, the record demonstrates that Mr. Zavagil repaid that amount in full by the end of the first 18 months of the tax period at issue. You said a second witness. Was it Henke, or did you say a different name? Ms. Fries is who testified. Ms. Henke did not testify at the trial. The third witness at the trial was Collette Carlson, who was the tax preparer for both the Zavagils and for American Solutions for Business. And she testified as the person who prepared and reviewed both tax returns before they were signed and filed, that only the Zavagils claimed these charitable contributions because that was how the system was supposed to work. American Solutions, as the agent for the Zavagils, advanced the funds. The Zavagils, at that point, were indebted to American Solutions. And under the commissioner's own regulations and under the case law that's established to date, the contributions were to be taken in 2004 or 2005, in the years that they were taken, not at a later date when they were ultimately repaid. The Zavagils demonstrated bona fide evidence of debt without realizing that that was what the commissioner was ultimately going to settle on in order to attempt to beat back the Zavagil's claim. What recourse did ASB have if Zavagil just decided not to repay these ledger amounts? Well, Your Honor, as Judge Loken pointed out, ASB owed the Zavagils, by this point in the 20-year payment arrangement, about $20 million. It owed a couple million dollars a year. So it could have offset the amount that the Zavagils owed if the Zavagils were unwilling to repay it and have applied the share purchase payments toward the Zavagil's outstanding debt. That would have been the quickest and easiest way for ASB to obtain repayment. ASB, of course, also had legal recourse to the courts. It could have sued the Zavagils. And, in fact, the ledger itself would have at least made out a claim for account stated under Minnesota law in addition to other claims like breach of contract and the like that ASB could have claimed against the Zavagils had they defaulted. But they didn't default. The evidence before the tax court was that the Zavagils had an outstanding debt obligation that they themselves recognized they owed to ASB and that ASB had been collecting from them. And, therefore, the Zavagils were entitled to claim these charitable contributions on their 04 and 05 tax returns. Thank you, Your Honors. Thank you, Counsel. Case has been well briefed and argued. Interesting question and argument was helpful. I appreciate that.